AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Odimar Aragon Pandales<br><br>*Defendant(s)* | )<br>)<br>)  Case No. **8:19MJ2149AEP**<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __September 2015 to the present__ in the county of __Manatee__ in the
__Middle__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 371 | Conspiracy to defraud the United States and obstruct justice |
| 18 U.S.C. 1503 | Obstruction of justice |

This criminal complaint is based on these facts:

See Affidavit

☐ Continued on the attached sheet.

_____
*Complainant's signature*

Ashley Haynes, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/30/19

_____
*Judge's signature*

City and state: Tampa, Florida

ANTHONY E. PORCELLI, U.S. Magistrate Judge
*Printed name and title*

# Reminder!

**Please be sure to file a Notice of Appearance immediately upon receipt of the Complaint Court Number**

**This will ensure that future ECF notices will be received**

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Ashley Haynes, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation (hereinafter "FBI"), and have been since June 2016. I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7). As such, I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516. In my capacity as an FBI Special Agent, I have received training regarding the use of search warrants, including legal requirements which govern this investigative technique. In my capacity as an FBI Special Agent, I have investigated criminal violations of federal laws, including, but not limited to, 21 U.S.C. §§ 841, 843 and 846 (drug trafficking offenses), 21 U.S.C. §§ 960 and 963 (drug importation and exportation offenses), and 18 U.S.C. §§ 371 and 1503 (conspiracy to defraud the United States and obstruction of justice offenses).

2. I have been involved in a wide variety of investigative matters, including investigations targeting criminal enterprises, often involving drug trafficking, firearms trafficking, and obstruction offenses. During the course of these investigations, I have coordinated the execution of search and arrest warrants, conducted physical surveillance, utilized confidential sources and undercover employees, analyzed records documenting the purchase and sale of illegal narcotics, analyzed information obtained from court-ordered pen register/trap and trace intercepts, and communicated with informants and subjects, as well as other local, state, and federal law enforcement officers regarding such investigations. Through the course of my training and experience, I have become familiar with some of the methods used by persons engaged in criminal acts to disguise the fruits of their illegal activities.

3. In addition to my training and experience with the FBI, I am an attorney and have been a member of the bars of the state of Indiana and the United States District Courts for the Northern and Southern Districts of Indiana since 2012.

4. I submit this affidavit in support of a criminal complaint charging **Odimar Aragon Pandales** with conspiracy to defraud the United States and obstruction of justice, in violation of 18 U.S.C. §§ 371, and substantive acts of obstruction of justice, in violation of 18 U.S.C. § 1503. These crimes took place in the Middle District of Florida, and elsewhere, and are being investigated by the FBI.

5. The statements contained in this affidavit are based upon my personal knowledge and experience, information and records gathered during this investigation, as well as information conveyed to me by witnesses and other law enforcement officials. Because this affidavit is meant only to establish probable cause that **Odimar Aragon Pandales** violated 18 U.S.C. §§ 371 and 1503, I have not included all facts known to me about this investigation.

## PROBABLE CAUSE

### A. Summary

6. During the timeframe of the conspiracy described below, **Odimar Aragon Pandales** ("**Pandales**") charged his co-conspirator, a drug trafficker residing outside of the United States (hereinafter "Target-1"), a minimum of $240,000.00 for information to be used to secure a sentence reduction based on substantial assistance. During this operation, **Pandales** contacted another co-conspirator, a criminal defense attorney (hereinafter "Attorney-1"), and recommended that Attorney-1 represent Target-1. **Pandales** explained that Target-1 had the financial resources to pay for information in order to procure a fraudulent substantial assistance sentence reduction. While Target-1 was not federally

indicted at the time this conspiracy began, Target-1 believed an indictment was on the horizon.

7. **Pandales** and Attorney-1 agreed that **Pandales** would provide information related to drug trafficking activities—specifically, the movement of large shipments of contraband aboard maritime vessels—for a fee. Attorney-1 would then pass the information along to Target-1, who paid the fee for the information. Target-1 would provide this information to the United States Government in exchange for consideration for a substantial assistance sentence reduction. Target-1 was responsible for paying **Pandales's** fee for the information.

8. To date, **Pandales** has received $60,000.00 for information provided to benefit Target-1 and maintains he is still owed an additional $180,000.00 for information already provided.

B. <u>U.S.S.G. § 5K1.1 and Federal Rule of Criminal Procedure 35</u>

9. Section 5K1.1 of the United States Sentencing Guidelines ("5K1.1") and Rule 35(b) of the Federal Rules of Criminal Procedure ("Rule 35") set forth the procedure by which a United States District Court, upon motion by the United States, may reduce a defendant's sentence for providing substantial assistance to the United States in the investigation or prosecution of another person.

10. In particular, 5K1.1 authorizes the United States to file a pre-sentence motion to depart downward from the defendant's guidelines range if the defendant provided substantial assistance in the investigation or prosecution of another person. Typically, a reduction in a defendant's guidelines range results in a reduced sentence.

11. Rule 35, on the other hand, authorizes the United States to file a post-sentence motion to reduce a defendant's sentence for providing substantial assistance to the

United States in the investigation or prosecution of another person.

12. The United States Attorney's Office for the Middle District of Florida (hereinafter the "USAO MDFL") — the federal prosecuting authority in the Middle District of Florida — has the authority to determine whether a defendant has provided substantial assistance to the United States and whether to file a motion to reduce the defendant's sentence pursuant to 5K1.1 or Rule 35.

13. Typically, before filing a 5K1.1 or Rule 35 motion to reduce a defendant's sentence, the USAO MDFL requires the defendant to personally provide substantial assistance to the United States in its investigation or prosecution of another person for committing a federal or state crime. Accordingly, in the typical case, a defendant will personally provide substantial assistance to the United States and, as a reward for that assistance, the USAO MDFL will file a 5K1.1 or Rule 35 motion with the United States District Court to reduce the defendant's sentence.

14. Without the filing of a 5K1.1 motion by the United States, a U.S. District Court does not have the authority to depart downward from a defendant's guidelines range based on substantial assistance;[1] and without the filing of a Rule 35 motion by the United States, a U.S. District Court does not have the post-sentence authority to reduce a defendant's sentence based on substantial assistance to the United States.

### C. The Subject of the Investigation

15. **Odimar Aragon Pandales** ("**Pandales**") is a Colombian national with deferred action status in the United States. **Pandales** is in a unique position to obtain information on drug trafficking activities.

---

[1] A U.S. District Court, however, may vary downward from a defendant's guidelines range based on the defendant's cooperation provided to the United States.

4

16. In January 2011, **Pandales** was charged in a two-count federal indictment with conspiracy to possess with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine while on board a vessel subject to the jurisdiction of the United States and conspiracy to manufacture and distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine. *See* Case No. 8:11-cr-00027-SDM-TGW.

17. Attorney-1 is an attorney licensed to practice law in Florida. He was admitted to the Florida Bar in 2006. Attorney-1 represented **Pandales** throughout the pendency of that aforementioned case.

18. On April 26, 2012, **Pandales** pleaded guilty to both counts in the indictment.

19. Between 2012 and 2015, **Pandales** provided information to the United States regarding drug trafficking activities, specifically on the high seas. This cooperation resulted in a significant 5K1.1 sentence reduction, lowering his sentence from an advisory guidelines range of 262 - 327 months to 12 - 18 months in prison. As such, on November 23, 2015, the U.S. District Judge sentenced **Pandales** to time served and five years' supervised release.

20. **Pandales** is in a unique position to acquire, and has repeatedly acquired, information relating to international drug trafficking activities, specifically those relating to the shipment of controlled substances on the high seas.

### D. The Conspiracy

21. Beginning on an unknown date, but no later than in or around September 2015, and continuing through the present, in the Middle District of Florida, and elsewhere, **Pandales** and Attorney-1 did unlawfully, willfully, and knowingly conspire to:

   a. defraud the United States for the purpose of impeding, impairing, obstructing, and defeating—through deceit, craft, trickery, and dishonest means—the lawful

governmental functions of (i) the USAO MDFL in determining whether to file a 5K1.1 or Rule 35 motion for various federal defendants, based on substantial assistance, and (ii) the United States District Court for the Middle District of Florida (hereinafter the "USDC MDFL") in deciding whether to grant that 5K1.1 or Rule 35 motion to reduce the guidelines range or prison sentences of those federal defendants; and

      b.    corruptly endeavor to influence, obstruct, and impede the due administration of justice in a pending judicial proceeding in the USDC MDFL.

22.    For example, **Pandales** and Attorney-1 conspired to fraudulently obtain a sentence reduction for a known drug trafficker residing outside of the United States (hereinafter referred to as "Target-1"). To accomplish the conspiracy, **Pandales** engaged in the following acts:

      a.    **Pandales** specifically recruited Attorney-1 to act as Target-1's attorney in this substantial assistance scam. Although Attorney-1 never officially represented Target-1, Attorney-1 was the conduit between **Pandales** and Target-1 throughout the duration of this conspiracy;

      b.    **Pandales** charged Target-1 a fee for obtaining information that could be falsely attributed to him for purposes of earning substantial assistance credit;

      c.    Despite the fact that **Pandales** had unique knowledge of the process of obtaining substantial assistance credit, **Pandales** knowingly sold the same to Target-1 to fraudulently acquire sentencing benefits for Target-1;

      d.    **Pandales** had numerous communications with Attorney-1 regarding the substantial assistance scam involving Target-1;

      e.    **Pandales** met with Attorney-1 to discuss the substantial assistance plan for Target-1 and to receive payment for executing that plan;

  f. **Pandales** provided information which, he believes led to four separate interdictions of maritime vessels carrying substantial amounts of cocaine. **Pandales** provided this information to Attorney-1 who then forwarded it on to Target-1;

  g. **Pandales** concocted a fee structure for the information he sold to Target-1. All told, **Pandales** charged Target-1 $240,000 for the four interdictions, $60,000 for each;

  h. **Pandales** recruited a family member in Colombia to receive payments on his behalf so as to avoid law enforcement detection while he remained in the United States;

  i. To date, **Pandales** has received $60,000 for the information he provided to Target-1; and

  j. **Pandales** expects to receive an additional $180,000 for the other three interdictions.

23. By knowingly selling information related to drug trafficking/smuggling activities to Attorney-1, with the intention that such information would be falsely attributed to Target-1 for his benefit at sentencing, **Pandales** tried to perpetuate a fraud on the USAO MDFL and the USDC MDFL to obtain something for which Target-1 was otherwise not entitled – a reduction in his anticipated federal prison sentence.

### E. The 5K1.1 and Rule 35 Scheme Begins

24. In or around September 2015, and while he was on supervised release, **Pandales** and Attorney-1 concocted a plan wherein **Pandales** agreed to sell information to Attorney-1 regarding drug traffickers that could benefit Attorney-1's clients. **Pandales** knowingly made this offer despite his understanding of the 5K1.1 and Rule 35 process. **Pandales** also offered to refer federal criminal defendants to Attorney-1 for a fee. As such, the two began the aforementioned conspiracy. By way of example, based on a co-conspirator statement, on or about September 25, 2015, one of Attorney-1's clients provided information

to law enforcement about a vessel carrying hundreds of kilograms of cocaine. This information had been purchased from **Pandales** for tens of thousands of dollars. As another example, based on a co-conspirator statement, on or about December 30, 2015, one of Attorney-1's clients provided information used to interdict a vessel suspected of carrying hundreds of kilograms of cocaine; the crew scuttled the vessel before the cargo could be seized. Likewise, this information had been purchased from **Pandales** for tens of thousands of dollars.

25. In October or November of 2017, **Pandales** contacted Attorney-1 and advised that Target-1 was in need of a federal criminal defense attorney. After several months of communication, Attorney-1 met with Target-1 in Colombia in or around July 2018. During this meeting, Attorney-1 met privately with Target-1 to discuss the ruse wherein **Pandales** would relay information regarding various drug trafficking activities to Attorney-1 who would then relay the same to Target-1 for Target-1's benefit. Target-1 and his family members paid for the information provided by **Pandales**.

26. The vast majority of the communications between **Pandales** and Attorney-1 occurred over WhatsApp. **Pandales** maintained at least two separate WhatsApp accounts and used both to communicate with Attorney-1. Specifically, **Pandales** used the monikers "Poseidon's Eyes" and "Poseidon's Ears" to communicate with Attorney-1 on WhatsApp.

27. When **Pandales** had information regarding shipments of cocaine leaving Colombia on a maritime vessel, he sent that information to Attorney-1 to relay to Target-1. Attorney-1 then copied the information and sent it to Target-1 on his (Target-1's) WhatsApp account. Several of these conversations were saved in Attorney-1's WhatsApp account.

### F. February 2, 2019 Sale of Information

28. On February 2, 2019, **Pandales** and Attorney-1 exchanged the messages below

on WhatsApp. Unless otherwise stated, the recorded meetings and conversations with **Pandales** and Attorney-1 were in the Spanish language and have been translated into English.

**Pandales:** I have two pieces of information that could be important. Do you want me to forward to you?

Attorney-1: Go ahead.

**Pandales:** A white and blue go-fast with two – 200 motors is leaving tomorrow at 4:00 AM from El Charco in Nariño. It's carrying 1000 kilos of drugs and it's going to Costa Rica. [*Redacted name*] and [*Redacted name*] will be onboard.

A blue and white Flipper with two – 75 motors left today at 7:00 PM from El Parque de Sanquianga in Nariño. It's carrying 800 kilos of drugs and is headed to Mexico. [*Redacted name*] and [*Redacted name*] will be onboard. I'm waiting to hear about two events that will be canceled. Thanks.

Please let me know you got this.

I am going to forward you other information, but I need confirmation because this one left yesterday.

Attorney-1: Go ahead.

Received.

**Pandales:** Okay.

A semisubmersible with three 75 Yamaha motors left yesterday at 7:00 PM from Bocana de San Juan in Nariño. It is carrying about 1200 kilos of drugs and it's going to Costa Rica. [*Redacted name*] is onboard and the person who sent him was [*Redacted name*].

29. Based on my training, experience, and familiarity with this investigation, I believe when **Pandales** was advising that a white and blue go-fast boat with two 200 horsepower motors was leaving the following day from El Charco, a city in the Colombian Department of Nariño. El Charco is on the Pacific Coast. A go-fast is a small, fast boat with a narrow frame and a planing hull which allows the boat to travel at high rates of speed (an attractive characteristic to drug smugglers as the boat's speed can aid in the evasion of law enforcement). The remaining portion of **Pandales's** message regarding this go-fast is blatant,

9

he advised the boat was carrying 1,000 kilograms of drugs, likely cocaine, destined for Costa Rica, and provided the names of individuals aboard the vessel.

30. **Pandales** went on to detail a separate maritime vessel, a Flipper, which is a brand of boat, with two 75 horsepower motors. **Pandales** advised the Flipper left Sanquianga National Park, located in the Department of Nariño in Colombia, earlier that day. **Pandales** explained this boat was destined for Mexico with 800 kilograms of drugs, likely cocaine, and again provided the names of the individuals aboard this vessel.

31. **Pandales** provided information on a third vessel in this message string. **Pandales** advised the vessel was a semisubmersible with three 75 horsepower motors. Based on my training, experience, and familiarity with this investigation, I know that semisubmersible vessels are used by drug smugglers due to the fact that the partial submersion minimizes the vessel's visibility. **Pandales** explained the semisubmersible vessel was carrying 1,200 kilograms of drugs, destined for Costa Rica, and provided the name of the individual operating the vessel and the individual who arranged the voyage.

32. Pursuant to the agreement between **Pandales**, Attorney-1, and Target-1, Attorney-1 forwarded the information from **Pandales** to Target-1 on WhatsApp the very same day. Unless otherwise stated, the recorded messages between Attorney-1 and Target-1 were in the Spanish language and translated into English. Attorney-1 and Target-1 exchanged the following messages on February 2, 2019:

Attorney-1: A white and blue go-fast with two – 200 motors is leaving tomorrow at 4:00 AM from El Charco in Nariño. It's carrying 1000 kilos of drugs and it's going to Costa Rica. [*Redacted name*] and [*Redacted name*] will be onboard.

A blue and white Flipper with two – 75 motors left today at 7:00 PM from El Parque de Sanquianga in Nariño. It's carrying 800 kilos of drugs and is headed to Mexico. [*Redacted name*] and [*Redacted name*] will be onboard

> A semisubmersible with three 75 Yamaha motors left yesterday at 7:00 PM from Bocana de San Juan in Nariño. It is carrying about 1200 kilos of drugs and it's going to Costa Rica. [*Redacted name*] is onboard and the person who sent him was [*Redacted name*].

Target-1: Okay, sir.

33. As evidenced by the two separate message strings on February 2, 2019, **Pandales** provided detailed information regarding maritime vessels carrying sizable loads of drugs to Attorney-1 who then copied and pasted the information into a WhatsApp message with Target-1.

### G. April 25, 2019 Sale of Information

34. On April 25, 2019, **Pandales** again reached out to Attorney-1 using his "Poseidon's Eyes" WhatsApp account with information to provide to Target-1 for a fee.

**Pandales:** Good afternoon.

**Pandales:** Good afternoon.

Attorney-1: I need to you send me an accounting of what is owed for the four projects with [*Target-1's name redacted*]. Even though the meeting with the official to confirm the events was delayed, I have confirmation that they have accounted for three of them. The fourth event with the device was not accounted for when they confirmed the first three that were pending. We are waiting for the official to meet with Target-1 to confirm precisely the four events. However I explained to Target-1 that with the implicit confirmation from the official that I need him to start charging for those services. I was not able to tell him a total amount or how much is owed for each one but I convinced him to at least give me an advance before the meeting. Please send me the accounting for each event that is owed. The 30 that were disbursed last week were for the other patient who is owed another 40 for shark IV.

**Pandales:** Hello, it is clear about the 30.

**Pandales:** The 40 are pending. In regards to Target-1, there four of 60 and one of those would be 240 until the rest is confirmed. I forwarded a list because the person in charge asked me for it and I am going to send the same list to Target-1 so he can use it to make his claim. The second device of the last ones we sent was installed yesterday. This is the information so you can forward it.

Attorney-1: [thumbs up emoji]

11

**Pandales:**  Gray and white Flipper with two motors, one 90 and one 50. It's carrying 800 kilos of drugs. It is leaving Saturday from San Juan to Costa Rica. It is being sent by [Redacted name] and his brother [Redacted name].

**Attorney-1:**  Yikes, I would love to forward that but until the situation is cleared up – [message cut off]

35.  Approximately 45 minutes after receiving the above described information, Attorney-1 forwarded the information he received from **Pandales** to Target-1 utilizing Attorney-1's WhatsApp account.

**Attorney-1:**  Good afternoon.

Gray and white Flipper with two motors, one 90 and one 50. It's carrying 800 kilos of drugs. It is leaving Saturday from San Juan to Costa Rica. It is being sent by [Redacted name] and his brother [Redacted name]. This last one has to be done because it has the device and there is no turning back. I will make sure that NY will take it into account.

36.  Target-1 confirmed receipt of this information the following day.

37.  Based on my training, experience, and familiarity with this investigation, I believe when **Pandales** stated, "there four of 60 and one of those would be 240 until the rest is confirmed," **Pandales** was advising Attorney-1 he had provided information on four vessels transporting cocaine, three of which had been interdicted, and **Pandales** had charged Target-1 $60,000 per interdicted vessel. The four interdictions would total $240,000. Furthermore, when **Pandales** stated, "I forwarded a list because the person in charge asked me for it and I am going to send the same list to Target-1 so he can use it to make his claim," **Pandales** was advising Attorney-1 he had provided the information to his designated law enforcement handler so Target-1 would be able to speak with the agent and provide proof the seizure information came from Target-1. I know this information did not come from Target-1, but in fact came from **Pandales**.

12

38. Based on my training, experience, and familiarity with this investigation, I believe when **Pandales** stated, "Gray and white Flipper with two motors, one 90 and one 50. It's carrying 800 kilos of drugs," he was referring to a specific type of boat with a "flipper boat design" which has a 90 horsepower motor and 50 horsepower motor. The remaining portion of **Pandales's** message regarding this vessel is blatant, he advised the boat was carrying 800 kilograms of drugs, travelling from San Juan and destined for Costa Rica. Furthermore, **Pandales** identified the load organizers.

### H. May 20, 2019 Sale of Information

39. On May 20, 2019, **Pandales** again reached out to Attorney-1 using his "Poseidon's Eyes" WhatsApp account with information he wished to sell to Target-1.

**Pandales:** A 32 foot boat with a white hull and gray trim, with the name ESCORPION 7 and two 200 Yamaha motors will leave from Majagual today at 11:00 pm. It's carrying 1000 kilos of drugs and it's going to Costa Rica. The delivery will be made early Wednesday morning. We were not able to obtain the names of the three crew members.

40. According to their plan, Attorney-1 promptly forwarded the exact same message to Target-1 on WhatsApp. Attorney-1 also included the photograph. Target-1 acknowledged receipt of the message and photograph.

41. Based on my training, experience, and familiarity with this investigation, I believe **Pandales's** message to Attorney-1 identifies a vessel known as ESCORPION 7 which is carrying 1000 kilograms of cocaine. I believe when **Pandales** states, "The ESCORPION 7 is leaving Majagual," he is referring to Majagual, Colombia, a town in Northern Colombia. The remaining portion of **Pandales's** message regarding this vessel is blatant, he advised the boat was carrying 1,000 kilograms of drugs, destined for Costa Rica.

42. On August 23, 2019, FBI personnel executed a search warrant on Attorney-1's cellular telephone. During a search of that telephone, FBI personnel reviewed communications between Attorney-1 and "Poseidon's Eyes" and "Poseidon's Ears" on WhatsApp. A review of these accounts reflected communications about anticipated drug smuggling operations.

### I. August 28, 2019 Meeting Between Pandales and Attorney-1

43. On August 28, 2019, Attorney-1 met with **Pandales** at **Pandales's** residence in the Middle District of Florida to provide a partial payment for the information **Pandales** provided to benefit Target-1. This meeting was recorded. Prior to the meeting, Attorney-1 placed $10,000 in U.S. currency in his bag which he carried into **Pandales's** residence. At the beginning of the meeting, **Pandales**, his wife, and Attorney-1 engaged in small talk. The conversation then revolved around the agreement between **Pandales**, Target-1, and Attorney-1 wherein Target-1 would pay a fee to **Pandales**, through Attorney-1, for information regarding criminal activities.

44. During this meeting, Attorney-1 asked **Pandales** how much money he believed Target-1 owed for information **Pandales** relayed.

Attorney-1: How – how much does he owe?

Pandales: Listen, I am not asking him, I am just simply saying the four that were followed by – by -- with the devices. I sent all this confirmed information to him where he can claim. This one, this is the collaboration he gave with the information from Galladita uh, that [UI]

Attorney-1: That was a – a seizure or –

Pandales: -- he gave information where it was located and everything. And since this person was captured.

Attorney-1: Oh, okay, but that is not my responsibility.

Pandales: No, no, no, but – but -- but those were things I gave him, right?

Attorney-1: Of course.

45. Based on my training, experience, and familiarity with this investigation, I believe **Pandales** advised he was owed for four separate interdictions. **Pandales** attested he provided verified information and Target-1 was able to confirm at least one person was captured by law enforcement. Attorney-1 agreed that **Pandales** provided information believed to have led to four separate interdictions.

46. Throughout the conversation, **Pandales** pointed to a typed or computer-generated document he created that detailed each of the interdictions he referenced. In fact, **Pandales** stated, "Because that was what I gave you because I don't want to – well, since you have this [*referencing document in his hands*]. This is what I gave him. He has the whole list. This is operation 0885 and I..."

47. **Pandales** and Attorney-1 then discussed the amount of money **Pandales** received from Target-1 for information provided to date.

Pandales: No. I think it has been...I think he has paid two. Well, he made a payment now for the last--

Attorney-1: He made a payment for the last four that we are claiming.

Pandales: --four. He made a payment of 50, which is already – and, and the 10 you just gave me.

15

Attorney-1: Right.

**Pandales:** Do you understand me? But –

Attorney-1: Yes.

---

Attorney-1: Well, how – how much is it then? The...

**Pandales:** Well, at this time with the 50 he gave he [UI] 60.

Attorney-1: Fifty plus this 10.

**Pandales:** Yes, the 60. It comes to, for the four, right? The ones we installed the – it's 60 which was two – 240, right? So at 60 that would be 180, right? Like I am telling you. He is fighting for all of this because all of this is done. All those cases are verified by them and I have substantiated it. And that is what he has to argue for. I am not interested – like I said. I'll help you with whatever I can, you know?

Attorney-1: Of course.

As such, at the time of the August 28, 2019 meeting, **Pandales** was paid $60,000 for the information he sold to Target-1.

  48. At one point during the conversation, Attorney-1 asked **Pandales** if Target-1 was currently under investigation by law enforcement. **Pandales** confirmed, "They have a case on him...yes, they have a case." **Pandales** admitted to knowing that Target-1 was a subject of an investigation, further confirming the notion that **Pandales** knew the information he is selling to Target-1 is being used in an effort advance this substantial assistance scam. In fact, **Pandales** stated, "Why would you have to force someone who is cooperating? And he is cooperating...If he would have been someone who wasn't cooperating, then they would have to put forth the effort to keep on getting information and witnesses on him to formulate the case on him." Again, **Pandales** confirms his knowledge that Target-1 is cooperating with law enforcement using the information he sold to Target-1 and as a result of that cooperation, law enforcement officials have not continued investigative efforts regarding Target-1's criminal activity.

## CONCLUSION

49.    Based on the foregoing, there is probable cause to believe that **Pandales** conspired to defraud the United States and to obstruct justice, in violation of 18 U.S.C. § 371, and endeavored to obstruct the administration of justice, in violation of 18 U.S.C. § 1503.

_____
Ashley Haynes, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this ___30th___ day of August 2019, in Tampa, Florida.

_____
ANTHONY E. PORCELLI
United States Magistrate Judge